Filed 4/18/14  In re D.R. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re D.R., a Person Coming Under the Juvenile Court Law. | B250130 (Los Angeles County Super. Ct. No. CK99123) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JULIANA A., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles Philip L. Soto, Judge. Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jeanette Cauble, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minor.

* * * * * *

Juliana A. (Mother) appeals from the juvenile court's jurisdictional and dispositional orders and findings of May 22, 2013, made with respect to her daughter D.R. The juvenile court sustained a petition alleging Mother's substance abuse, unresolved domestic violence issues, and inappropriate plan for her daughter's ongoing care and supervision placed D.R. at risk of harm within the meaning of Welfare and Institutions Code section 300, subdivision (b).[1] Mother contends the evidence was insufficient to support dependency jurisdiction and removal from her custody.

Substantial evidence supports the juvenile court's findings. We affirm.

### FACTS AND PROCEDURAL BACKGROUND

*Events Leading to D.R.'s Detention*

In March 2013, the Los Angeles County Department of Children and Family Services (the Department) received a referral alleging general neglect by Mother. Mother and Louie R. (Father)[2] are the parents of D.R. who was born in August 2010. Father and Mother were not legally married and Father was incarcerated.

On March 10, 2013, Mother was arrested for petty theft. On March 12, 2013, the Department's social worker (CSW) assigned to the case met with paternal grandmother (Sandra H.). Sandra H. was concerned because Mother constantly moved D.R. between maternal grandparents and Sandra H. Sandra H. believed the maternal grandparents were abusing drugs.[3] They frequently asked Mother for money when she visited them. Sandra H. believed the maternal grandparents wanted D.R. so they could get Mother's welfare money and food stamps. Sandra H. told the CSW about an incident that took place around Christmas 2012. Mother brought D.R. to Sandra H.'s home at approximately one

---

[1]    Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

[2]    Father is not a party to this appeal.

[3]    Maternal grandparents had an open DCFS case for their minor son as a result of domestic violence in their home, and their drug use.

2

o'clock in the morning. Mother was drunk and smelled of alcohol. D.R. "smelled real bad" and told Sandra H. that Mother "got hit by a boy and she was crying."

On April 17, 2013, Sandra H. informed the CSW that Mother had been sentenced to one year in jail. Sandra H. wanted to take D.R. to the doctor but D.R. had no medical information. Sandra H. was concerned because she had no legal rights to D.R. and the maternal grandparents wanted to keep her.

On April 18, 2013, CSW met with Father at the North County Correctional Facility. Father had an extensive criminal history including arrests for possession of firearms, gang injunctions, and substance abuse. He was incarcerated for possession of methamphetamines but said he preferred to use marijuana. He admitted to a domestic violence incident with Mother. He heard maternal grandparents yelling at each other and "heard rumors" they used drugs. The CSW met with Mother on the same day at the Century Regional Detention Facility. Mother stated that she knew maternal grandparents had an open case with DCFS and that they were "using meth." She said she left D.R. with them on several occasions because they told her they were testing negative for drugs.

### *Section 300 Petition and Detention Hearing*

On April 23, 2013, the Department filed a section 300 petition on behalf of D.R., pursuant to subdivision (b). The petition alleged that Mother made an inappropriate plan for D.R.'s care and supervision and endangered her health and safety by leaving her with maternal grandparents who Mother knew were methamphetamine abusers and had an open case with the Department. The petition also alleged that both Mother and Father had a history of substance abuse. Mother currently abused alcohol and in December 2012 was under the influence of alcohol when caring for D.R. Father was a current abuser of marijuana and was incarcerated for possession of a controlled substance. Both parents who were in custody appeared at the hearing. The juvenile court continued the matter for a contested disposition.

3

*Amended Section 300 Petition and Jurisdiction/Disposition Report*

On May 17, 2013 the Department filed a first-amended section 300 petition adding an allegation that Mother and Father had a history of domestic violence. On April 25, 2011, both parents were arrested for physically assaulting each other.

In its May 17, 2013 report, the Department reported that Mother and Father had no prior history with the Department. In 2010, approximately six months before D.R. was born, the juvenile court sustained a petition filed on behalf of Mother's younger brother, Juan. The court found that maternal grandparents had a history of domestic abuse involving altercations in the presence of the minor in which maternal grandfather brandished a gun and chased maternal grandmother and minor and threatened to kill maternal grandmother; maternal grandfather had a history of alcohol and substance abuse and was a current abuser of alcohol and marijuana; maternal grandfather had a history of mental and emotional problems including a diagnosis of schizophrenia and failed to take his prescribed medications; and maternal grandmother had a history of illicit drug use and was a current user of amphetamines and methamphetamines.

The report also detailed a referral received by the Department on August 13, 2012, alleging that Mother and maternal grandparents used methamphetamines. The caller reported that all the adults were outside the home and D.R. was inside without adult supervision. It was also reported that D.R. regularly went hungry because Mother's money was spent by the middle of the month. Mother reported she was homeless in September 2012 and provided maternal grandparents' telephone number as a contact. Maternal grandparents denied the drug use allegations and denied Mother and D.R. ever lived with them. The investigation was closed as inconclusive because the Department was unable to locate Mother and D.R.

Regarding the allegation of domestic violence, Mother confirmed that when she and Father were together, he pulled her hair, choked her, and was controlling. She sustained numerous injuries including a "busted lip" and "marks and bruises." In 2011, she scratched Father while defending herself and both of them were arrested. Father and

4

Sandra H. also confirmed there was an incident in 2011. Maternal grandmother stated that Father was a "violent gang member" and was "no good." She stated that Mother and Father "used to get into fights with each other all the time."

Mother denied abusing drugs and stated she was not a current user of alcohol. She denied getting intoxicated in the past when she did consume alcohol. Sandra H. stated that while she never observed Mother using drugs, she believed she did based on the rumors she heard and from observing Mother's behavior. Sandra H. admitted that Father smoked marijuana, and Mother and Father "both hang around the same crowd around Highland Park area." Mother slept all day and did not get up to feed or attend to D.R. when she stayed with Sandra H. On one occasion around Christmas 2012, Mother brought D.R. to Sandra H.'s home at approximately 1:00 a.m. Mother smelled of alcohol. D.R. "smelled and looked like she had not been groomed." D.R.'s feet were "freezing cold without any socks" and she smelled of smoke. Maternal grandmother stated that Mother never drank in front of D.R. but did drink alcohol when she went out to party with her friends.

Mother denied the allegation that she made inappropriate plans for D.R.'s care and supervision. She stated she did not have a place to live and stayed with friends or in motels. She did not want D.R. living on the streets. She knew about her parents' open case with the Department regarding her younger brother but did not think it would affect her daughter. She never saw her parents use or abuse drugs and thought they were "doing good and testing clean." Mother stated she took a T-shirt that was worth no more than $20 from a Super A Market.[4] A security guard chased her outside the store. Mother said she was arrested because she got "too aggressive" when trying to defend herself from the security guard.[5]

---

[4] The police report indicated that the officers recovered two shirts and three spandex shorts from Mother's purse.

[5] Mother had a prior arrest as a juvenile for grand theft auto.

Sandra H. stated that Mother and Father were both irresponsible. They liked being on the streets, did not work, and did not know the value of money. Sandra H. purchased clothes, diapers, and milk for D.R. because neither Mother nor Father ever had any money. She did not know what Mother did with the welfare money and food stamps. Mother never had a stable or set plan for taking care of D.R. and shuttled her back and forth between the maternal grandparents and Sandra H. On one occasion, Mother left D.R. with Sandra H. for almost a week and did not call to check on D.R. In October 2012, Mother got into a fight at some apartments in Highland Park and was hospitalized as a result of being stabbed. D.R. had spider bites on her face and arms when Sandra H. picked her up from maternal grandparents home. When D.R. was younger she had a severe rash on her face and arms because maternal grandparents owned dogs and lived in a filthy environment. Maternal grandparents moved regularly and wanted to have D.R. at the beginning of the month so that they could collect her welfare and food stamps. Sandra H. picked up D.R. on March 2, 2013 because Mother and maternal grandmother argued over money. Mother refused to give maternal grandmother any money. When Mother was arrested on March 10, 2013, maternal grandparents demanded to have D.R. returned to them.

Maternal grandmother admitted that she tested positive for methamphetamine in December 2012 but stated she had not used drugs since then. She planned to enter a drug treatment program but was placed on a waiting list. She stated the open dependency case with the Department had nothing to do with D.R. Her son got arrested again, violated his probation, and was ordered into juvenile placement. By the time he got released, he would be 18 years old and the case would be closed. Maternal grandmother claimed that she and her husband "take really good care" of D.R.

### *Adjudication Hearing*

On May 22, 2013, the juvenile court received into evidence the Department's jurisdiction/disposition report and detention report. The Department recommended D.R. be declared a dependent of the juvenile court and that both parents be given reunification

services. The juvenile court amended the petition to strike the allegation of domestic violence pursuant to section 300, subdivision (a). The juvenile court sustained the petition as amended pursuant to section 300, subdivision (b). Specifically, the juvenile court found that Mother: "made an inappropriate plan for [D.R.'s] ongoing care and supervision" (b-1); and had "a history of substance abuse, and is a current abuser of alcohol" (b-3). The juvenile court also found that Father had "a history of illicit drug abuse, and is a current abuser of marijuana" (b-2), and that Mother and Father "have a history of domestic violence and engaging in violent altercations" (b-4).

The juvenile court declared D.R. a dependent under section 300. As to disposition, the juvenile court found that there was clear and convincing evidence that there was a substantial danger to D.R.'s physical health, safety, protection or physical or emotional well-being, if she were returned to her parent's custody. D.R. was placed under the supervision of the Department for suitable placement with Sandra H. Mother was ordered to participate in drug and alcohol counseling programs, drug and alcohol testing, and individual counseling.

## DISCUSSION

### I. Substantial Evidence Supported The Juvenile Court's Jurisdictional Finding

Mother challenges the sufficiency of the evidence as to the juvenile court's finding of jurisdiction under section 300, subdivision (b).

The juvenile court found the allegations under section 300, subdivision (b) to be true as alleged and thereby found that D.R. came under its jurisdiction. Mother concedes that the juvenile court properly took jurisdiction over D.R. on the grounds alleged regarding Father. However, she contends that there was no substantial evidence to sustain the allegations concerning her.

"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In

7

such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.  [Citations.]"  (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)  In other words, "'the juvenile court's jurisdiction may rest on a single ground.'  [Citation.]"  (*In re Christopher C.* (2010) 182 Cal.App.4th 73, 83.)

Here the juvenile court found the allegation against Father in the petition to be true, and Father did not appeal the juvenile court's jurisdictional findings.  The juvenile court properly took jurisdiction over the child, and we need not consider whether the other statutory grounds for jurisdiction were supported by the evidence.

However, we generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings (*In re D.C.* (2011) 195 Cal.App.4th 1010, 1015; see *In re I.A.* (2011) 201 Cal.App.4th 1484, 1494); or (2) "could have other consequences for [the appellant], beyond jurisdiction" (*In re I.A., supra,* at p. 1493 [not reaching the merits of an appeal where an alleged father "has not suggested a single specific legal or practical consequence from this finding, either within or outside the dependency proceedings"]).  Although dependency jurisdiction over D.R. is warranted because the findings based on Father's conduct are unchallenged, we will review Mother's appeal on the merits.

Specifically Mother contends (1) that her "suspected alcohol intoxication on one occasion does not constitute neglect"; (2) because Mother and Father were no longer together "there was no current risk of domestic violence"; and (3) Mother made an appropriate plan of care for D.R. while Mother was incarcerated.

"The standard of proof required in a section 300 dependency hearing is the preponderance of evidence.  [Citation.]  [¶]  'If there is any substantial evidence to support the findings of the juvenile court, a reviewing court must uphold the trial court's findings.  All reasonable inferences must be in support of the findings and the record must be viewed in the light most favorable to the juvenile court's order.  [Citation.]'

8

[Citation.]" (*In re Basilio T.* (1992) 4 Cal.App.4th 155, 168.) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.)

With that in mind, section 300 provides in relevant part: "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] . . . [¶] (b) The child has suffered, or there is a *substantial risk* that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (§ 300, subd. (b), italics added.)

Mother argues that there were no witnesses who stated they had ever seen her intoxicated in D.R.'s presence and the "mere possibility" of her alcohol abuse does not support dependency jurisdiction. But Sandra H. stated that around Christmas time in 2012 Mother was drunk and smelled of alcohol when she arrived at her home at approximately one o'clock in the morning. D.R. was filthy, smelled of smoke, her diaper had not been changed, and her feet were freezing from the cold because she was not wearing socks. Mother was impaired and unable to attend to D.R.'s basic needs. Maternal grandmother also stated that Mother would go out and party with her friends instead of caring for D.R., and that when Mother partied with her friends she drank alcohol. Mother 's argument is based on a misunderstanding of the sufficiency of the evidence in a dependency proceeding. "The rights and protections afforded parents in a dependency proceeding are not the same as those afforded to the accused in a criminal

9

proceeding. For example, a juvenile court may rely on hearsay contained in a social worker's report to support a jurisdictional finding in a dependency case, although such evidence could not be used to establish guilt in a criminal proceeding." (*In re James F.* (2008) 42 Cal.4th 901, 915.) Mother's reported inability to provide care for D.R. because of her alcohol abuse supports the juvenile court's jurisdictional finding.

Mother and Father engaged in violent altercations on numerous occasions which resulted in arrests for both of them. Father pulled Mother's hair, choked her, and left her with bruises and marks. Mother scratched Father. Father asked Sandra H. to hold D.R. while he attempted to throw Mother out of the house. Mother now argues that D.R. was no longer at risk of harm from domestic violence because Mother and Father had separated. Father was incarcerated. But Mother's argument is undermined by the evidence that Father's incarceration did not bring an end to Mother's involvement in violence with persons other than Father. In October 2012, Mother got into an altercation and was stabbed resulting in injuries requiring hospitalization. In December 2012, D.R. told Sandra H. that a "boy hit mommy on the face" and demonstrated how it happened. D.R. said that Mother cried and was angry. The court could clearly infer that Mother had not learned how to avoid violent altercations and D.R. was still at risk of harm at the time of the jurisdictional hearing.

Mother contests the finding that she made an inappropriate plan of care for D.R. because Mother often left D.R. in the care of Sandra H. and the Department eventually approved D.R.'s placement with Sandra H. Therefore, Mother argues her actions did not present a risk of harm to D.R. Mother relies on *In re Noe F.* (2013) 213 Cal.App.4th 358 (*Noe F.*).

In *Noe F.*, the mother identified several relatives to care for her child following her incarceration for gang-related activities. (*Noe F., supra*, 213 Cal.App.4th at p. 365.) The child's paternal grandmother stated she could not care for the child. The maternal

10

grandmother's nine-month old child died as a result of physical abuse while in her care. (*Id.* at p. 362.) Following a detention hearing, the child was placed in foster care and then with maternal great-aunt whom mother had also identified. (*Id.* at p. 365.) The allegations against maternal grandmother based upon the death of her child were deemed unfounded as the Department's investigation concluded that maternal grandmother was unaware that her boyfriend abused the child. (*Id.* at p. 362.) After initially expressing her inability to care for the child, paternal grandmother agreed that she could care for him. (*Id.* at p. 366.) The appellate court reversed the juvenile court's finding because mother had identified *suitable* placements for her child and "her incarceration, without more, cannot provide a basis for jurisdiction." (*Ibid.* citing *In re S.D.* (2002) 99 Cal.App.4th 1068, 1077.)

Mother's reliance on *Noe F.* is misplaced. Here the juvenile court's finding was not based on either Mother's incarceration or her decision to leave D.R. with Sandra H. on certain occasions. The basis for jurisdiction was because Mother repeatedly placed D.R. with maternal grandparents who were *unsuitable* caregivers even though she was aware of the following facts: maternal grandparents had substantiated allegations of child abuse or neglect involving Mother's younger sibling, maternal grandmother tested positive for methamphetamine as recently as December 2012, maternal grandparents had a transient lifestyle and moved from place to place, they lived in a dirty environment and while in their care D.R. had suffered a severe rash and insect bites on her arms and face. Moreover, maternal grandparents constantly asked Mother for money and food stamps and Mother was aware that their interest in caring for D.R. was dependent on their having access to D.R.'s welfare money and other benefits. Mother's lack of judgment in repeatedly placing D.R. with extremely inappropriate caregivers who had neglected D.R. in the past distinguishes this case from *Noe F.*

11

Substantial evidence supported the juvenile court's finding that D.R. was described by section 300, subdivision (b) as a result of Mother's conduct.

## II. Substantial Evidence Supported the Juvenile Court's Removal Order

Mother also contends the juvenile court erred when it ordered D.R. removed from Mother's custody because D.R. was not at risk of harm. Again, we disagree.

Pursuant to section 361, subdivision (c)(1), the juvenile court may remove a dependent child from his parents' custody upon clear and convincing evidence of a substantial danger to the child's physical health or well-being if there are no other reasonable means to protect the child. Such an order "is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citations.]" (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136, overruled on other grounds in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 736.)

The standard has obvious parallels to the jurisdictional issue discussed above, and the juvenile court's jurisdictional findings are prima facie evidence D.R. cannot safely remain in Mother's custody. (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146 (*Hailey T.*).) At the jurisdictional hearing there was evidence of Mother's alcohol use, history of domestic violence, and lack of judgment in adequately supervising or protecting D.R. Furthermore, at least one incident of violence occurred in D.R.'s presence when Mother was drunk. The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child. (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

12

**DISPOSITION**

The orders of the juvenile court are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J. *

                  FERNS

We concur:


_____, P. J.

    BOREN


_____, J.

    ASHMANN-GERST

---

\*    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.